IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 28, 2015

## STATE OF TENNESSEE v. PONCHO JUAN DELGADO

**Appeal from the Criminal Court for Washington County**
**No. 33011     Robert E. Cupp, Judge**

---

**No. E2014-01101-CCA-R3-CD – Filed June 22, 2015**

---

The Defendant, Poncho Juan Delgado, appeals as of right his jury conviction for first degree premeditated murder.[1]  See Tenn. Code Ann. § 39-13-202.  On appeal, the Defendant contends that the State failed to prove the element of premeditation.  The State responds that ample evidence of premeditation was presented.  Following our review, we conclude that the evidence was sufficient to establish premeditation, and we therefore affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

James T. Bowman (at trial and on appeal), and Donna M. Bolton (at trial), Johnson City, Tennessee, for the appellant, Poncho Juan Delgado.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
PROCEDURAL AND FACTUAL BACKGROUND

*I. Procedural Background*

This case arises from the violent stabbing death of the victim, Robert Curtis, and the subsequent burning of the victim's house on May 25, 2006.  On January 9, 2007, the

---

[1] The Defendant was also convicted of arson, see Tennessee Code Annotated section 39-14-301, but he does not challenge that conviction in this appeal.

Washington County Grand Jury returned a true bill of indictment charging the Defendant with first degree premeditated murder and arson.

The Defendant's first trial began on April 8, 2008. However, the next day, the trial judge became seriously ill, and no further action was taken in the case until April 22, 2008. At that time, the trial court held a hearing to determine whether the trial should continue or, instead, whether a mistrial should be granted. At the hearing, several jurors testified that on April 9, 2008, they were instructed by the court clerk that the trial had been delayed. Shortly thereafter, the clerk left jurors a voicemail message informing them that the trial had been "cancelled." Believing that their duties and obligations with respect to the case had been terminated, several jurors admitted subsequently reading newspaper articles about the case, speaking with family and friends about the case, and discussing discrepancies in witnesses' testimony.

At the conclusion of this testimony, defense counsel requested a mistrial, and the trial court granted this request. Defense counsel then moved to have the indictments against the Defendant dismissed. The trial court denied this request, concluding that a manifest necessity existed for the mistrial and, therefore, that principles of double jeopardy did not preclude a retrial on the charges.

The Defendant subsequently pursued an interlocutory appeal challenging the trial court's decision, arguing that principles of double jeopardy precluded retrial. A panel of this court denied the Defendant relief on February 5, 2010. See State v. Poncho Juan Delgado, No. E2008-01228-CCA-R9-CD, 2010 WL 424257 (Tenn. Crim. App. Feb. 5, 2010), perm. app. denied (Tenn. June 17, 2010). In upholding the trial court's decision, we noted that the Defendant had requested the mistrial, an action which typically "remove[s] any barrier to reprosecution." Id. at *3 (quoting United States v. Jorn, 400 U.S. 470, 485 (1971)). We concluded that "[g]iven the unique circumstances of the instant case, namely the delay due to the judge's illness and the jury's exposure to outside influences, . . . manifest necessity required a mistrial be declared," and "[b]ecause there was a manifest necessity for the mistrial, a retrial [was] not prohibited on double jeopardy grounds." Id. at *5. The Defendant's case proceeded to trial again on March 25, 2013, where the following facts were presented.

## II. Factual Background

On May 25, 2006, the Johnson City Fire Department ("JCFD") responded to a call that a house was on fire. When firefighters arrived on the scene at approximately 9:00 p.m., they were informed that there might be a person inside the house. After an unsuccessful attempt to gain entry through the front door, JCFD firefighter Russell Sells, Jr., was able to enter the burning house through a window on the front of the house.

Upon entering the house, Mr. Sells found a body lying on the floor, which was partially blocking the front door. Mr. Sells began to move the body outside the house when he realized that the body was covered in blood. At that point, Mr. Sells determined that the man was already deceased from injuries unrelated to the fire. He laid the body back down inside the house and "established a crime scene . . . to make sure that the scene wasn't contaminated any further . . . ."

Agent John Sipos, currently of the Tennessee Bureau of Investigation ("TBI"), testified that in May 2006 he was an investigator with the Johnson City Police Department ("JCPD") and that he was in charge of processing the crime scene at the victim's home. Agent Sipos arrived at the victim's home around 9:00 or 9:30 p.m. but was unable to enter until the fire had been extinguished, which was around 11:00 or 11:30 p.m. Although Mr. Sells had moved the victim's body, investigators were able to determine the original positioning of the body due to a large blood stain located on the carpet behind the front door, adjacent to the living room.

Agent Sipos identified blood splatter on a vacuum cleaner in the vicinity, which he described as "castoff of blood." He explained that the "castoff" pattern indicated "a stabbing motion and the blood slinging off the knife as it went back and forth." Agent Sipos also located blood of the "same castoff type nature" on the baseboard area near the front door. According to Agent Sipos, certain items appeared to have been knocked over inside the living room, leading him to believe that a violent struggle had taken place. Agent Sipos was unable to obtain fingerprint evidence from the home because soot from the fire "attache[d]" to the hard surfaces in the house, making it "almost impossible to even locate a print." Investigators collected several blood samples from the crime scene, which were sent to the TBI crime lab for deoxyribonucleic acid ("DNA") testing. Each of the samples matched the victim's DNA, and no DNA from other contributors was located at the scene.

Officer Jason Abernathy of the JCPD testified that he was the lead investigator assigned to investigate the victim's murder. Officer Abernathy estimated that he entered the victim's house about ten to fifteen minutes prior to Agent Sipos. According to Officer Abernathy, when he entered the house, the victim's body was lying face-down, and he was unable to see the victim's injuries until he was turned over, which was about an hour to an hour and a half after entering the house.

Meanwhile, other JCPD investigators began "checking nearby housing areas like Carnegie and Tyler Apartments" to gain information about the crime. While Officer Abernathy was waiting to enter the victim's home, he received a call from another investigator who had spoken with individuals linking the Defendant to the victim's murder. Apparently, the Defendant had told several residents at Tyler Apartments that he

-3-

had "cut and killed a man." At the time, Officer Abernathy was unable to confirm this information because he had yet to enter the victim's house or turn the victim over. Officer Abernathy agreed that this information ended up being "significant" given that it showed that the Defendant relayed information about the victim's wounds to a third party at a time when even the police were unaware of the victim's injuries. At that point, the Defendant became the "number one person of interest . . . ."

Bonnie Peck Griffith testified that she knew the Defendant and that she was living with her brother in Tyler Apartments in May 2006. She testified that Tyler Apartments was located seven or eight blocks from the street where the victim lived. According to Ms. Griffith, the Defendant approached her while she was outside her brother's apartment on the night of May 25, 2006. She remembered that it was dark outside, although she was uncertain of the exact time. When the Defendant approached Ms. Griffith, he was covered in blood "from [his] neck to his shoes[,] including his socks," and he told Ms. Griffith that he "need[ed] some help." Ms. Griffith entered her brother's apartment with the Defendant, and the Defendant told Ms. Griffith and her brother what had happened.

According to Ms. Griffith, the Defendant told them that he "had just killed someone for messing with his nephew[,] . . . that [the victim] had molested his nephew[,] and [that] he took care of it because nobody messes with family." Additionally, the Defendant said that "he cut the victim on both sides of his neck and down through his throat to the sternum" and that he "cut the victim open, all the way open." The Defendant also said that, after killing the victim, he "torched the place." Ms. Griffith described the Defendant as being "very upset," adding that he "was not calm at all, he was really upset about the situation."

Ms. Griffith's brother provided the Defendant with clean clothes, and the Defendant placed his blood-soaked clothes in a plastic bag. Ms. Griffith testified that the Defendant had three knives in his possession. She described the knives as a "double-sided straight knife," a knife with "a hook on the end [that] was kind of shaped weird," and one that was in a case, which she could not see. The Defendant asked for lighter fluid before leaving Ms. Griffith's brother's house, and he then left the house with his bag of bloody clothes and the lighter fluid. According to Ms. Griffith, the Defendant left in search of a pair of shoes that would fit him. Ms. Griffith denied calling the police to report the Defendant, explaining that she "didn't want to get involved." According to Ms. Griffith, when police arrived at Tyler Apartments, a neighbor informed the police that Ms. Griffith had spoken with the Defendant, and the police questioned her about the Defendant's whereabouts that same night.

James Allen Hale testified that he was the Defendant's cousin and had known the Defendant for most of his life. On May 26, 2005, the Defendant came to Mr. Hale's

-4-

apartment and asked for a pair of shoes, and Mr. Hale gave the Defendant a pair of his "old work shoes." The Defendant told Mr. Hale that he had killed someone, but Mr. Hale did not believe him. The Defendant was wearing clean clothes, and Mr. Hale did not notice any blood on him. Mr. Hale estimated that the Defendant was at his apartment for no more than ten minutes.

June Little testified that she was the Defendant's half-sister and that the Defendant "just showed up" at her house the day after the victim's murder. The Defendant told Ms. Little that "he messed up" and "needed [her] help." The Defendant told Ms. Little that he killed a man and, specifically, that "he gutted [the victim]." Ms. Little testified that she had seen a picture of the Defendant on the news and heard that the police were looking for him. According to Ms. Little, the Defendant was intoxicated when he arrived at her house, and she wanted him to sober up before he turned himself in to the police. The Defendant had two knives with him, which she described as two daggers—one with a broken tip and another with a hooked blade. Ms. Little testified that the Defendant eventually threw both knives into the sewer. Several days later, Ms. Little and her husband drove the Defendant to the police station so that he could turn himself in.

When the Defendant arrived at the police station, Officer Abernathy spoke with him in an interview room. After Officer Abernathy read the Defendant his Miranda[2] rights, the Defendant asked for an attorney, and Officer Abernathy stopped the interrogation. However, Officer Abernathy remained in the room with the Defendant, and the Defendant told him that he had not eaten in several days. Officer Abernathy arranged for the Defendant to receive food, and the two men engaged in "small talk." In the course of this conversation, the Defendant twice told Officer Abernathy that he "didn't intend to kill that man."[3]

Dr. Theresa Allen Campbell testified that she was a forensic pathologist and that she performed the victim's autopsy. Dr. Campbell testified that, due to the extent of the victim's injuries, she performed the autopsy over a period of two days. Dr. Campbell determined that the victim's cause of death was multiple knife stab wounds with blunt force trauma to the head. In total, Dr. Campbell documented fourteen stab wounds to the victim's heart; twenty-two stab wounds to the left lung; a "long incision" stab wound to the abdomen; and multiple lacerations, abrasions, and contusions on the victim's head

---

[2] See Miranda v. Arizona, 384 U.S. 436 (1966).

[3] Prior to his original trial, the Defendant filed a motion to suppress these statements, wherein he argued that his Miranda rights were violated. Following a hearing, the trial court denied the motion, finding that the Defendant was not subjected to custodial interrogation or its functional equivalent, see Rhode Island v. Innis, 446 U.S. 291, 301 (1980), after he asked for an attorney and that his incriminating statements were not responsive to police questioning but instead were merely "blurted out."

caused by blunt force trauma. She testified that each stab wound to the heart would have been life-threatening.

The Defendant testified on his own behalf. The Defendant denied that he murdered the victim, that he burned his house, that he was present when either the murder or arson occurred, or that he knew who was responsible. The Defendant admitted that he was an alcoholic and had abused drugs throughout his life. According to the Defendant, he could not remember everything that happened on the night of the victim's murder. However, he did recall that he had been drinking and smoking crack cocaine. He testified that he went to an area near some railroad tracks, lay down in some bushes, and got high. When the Defendant began to walk back towards some houses, "a bunch of dogs" began chasing him, and his flip-flops broke.

The Defendant then walked to James Hale's house and asked him for shoes. The Defendant denied telling Mr. Hale that he had killed someone. Eventually, the Defendant went to Ms. Little's house. Again, the Defendant denied telling Ms. Little that he had killed anyone. However, the Defendant said that while he was there, his "picture popped up on the news," and he learned that the police were looking for him in connection with a murder and arson. The Defendant testified that he "got scared" and eventually told his sister that he wanted to turn himself in.

The Defendant acknowledged that he said, "I didn't intend to kill that man" on two occasions while talking to Officer Abernathy. However, the Defendant explained that he "can say words and [not] know what they mean" and that he was "a dummy." He reiterated that he did not know the victim and denied any involvement in the victim's death.

Thereafter, the jury convicted the Defendant of first degree premeditated murder and arson. The Defendant received a sentence of life imprisonment for the murder conviction and three years on the arson conviction, with the sentences to be served concurrently. This timely appeal followed.

## ANALYSIS

The sole issue presented for our review is whether the evidence was sufficient to support the element of premeditation underlying the Defendant's first degree murder conviction. The Defendant contends that, although the victim "was stabbed many times," the Defendant's "state of mind before the killing is unknown." The State responds that "the brutality of the attack and cruelty displayed in the killing are evidence of premeditation." The State further responds that there was testimony that the Defendant killed the victim because the victim had molested the Defendant's nephew, providing

further support for the jury's conclusion that the murder was premeditated. We agree with the State.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to

contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors demonstrating the existence of premeditation include, but are not limited to, the following: the declaration of the intent to kill, the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, the infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, the destruction or secretion of evidence, and calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Further, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

Viewed in the light most favorable to the State, the evidence showed that the victim was stabbed over thirty times. Dr. Campbell testified that any one of the stab wounds to the victim's heart would have been fatal. The Defendant told Ms. Griffith, Mr. Hale, and Ms. Little that he had killed the victim. Furthermore, the Defendant told Ms. Griffith that he had killed the victim because the victim had "messed with" and "molested" the Defendant's nephew, establishing a motive for the crime. He also told Ms. Griffith that after he killed the victim, "he torched the place," apparently in an attempt to cover up the murder and destroy evidence. The Defendant also bagged his

bloody clothes, took lighter fluid with him when he left Ms. Griffith's brother's house, and disposed of the knives. From these facts, the jury was presented with ample evidence from which it could infer that the Defendant acted with premeditation. The Defendant's argument is without merit.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE